**UNITED STATES of America,
Plaintiff,**

v.

**Omar GENAO–SANCHEZ, a/k/a
"Omi", Defendant.**

**No. CRIM.97–284 (JAF).**

United States District Court,
D. Puerto Rico.

Jan. 15, 2002.

Francisco Acevedo–Padilla, Acevedo Law Office, Edif. Asociacion de Maestros, Hato Rey, PR, · Lydia Lizarribar–Buxo, Hato Rey, PR, for Omar F. Genao–Sanchez, defendant.

Pretrial Services, U.S. Pretrial Services, San Juan, PR.

US Probation, U.S. Probation Office, San Juan, PR.

US Marshal, U.S. Marshal Service, San Juan, PR.

### OPINION AND ORDER

FUSTE, District Judge.

Following a jury trial, Defendant, Omar Genao–Sánchez, a/k/a "Omi," was convicted of the following charges: Conspiracy to possess narcotics in violation of 21 U.S.C. § 846 (1994); conspiracy to commit firearms murder in relation to a drug trafficking offense in violation of 21 U.S.C. § 924(o) (1994); and firearms murder in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(j) (1994).

*Docket Document No. 1101.* On May 22, 2001, Defendant filed a motion for a new trial based on the alleged discovery of new evidence. *Docket Document No. 1356.* On August 28, 2001, this court denied Defendant's motion for a new trial. *Docket Document No. 1404.* Defendant now moves for reconsideration of our August 28, 2001 decision. *Docket Document No. 1411.*

### I.

### *Factual and Procedural Synopsis*

Defendant was a member of an underground drug-smuggling organization led by Víctor Manuel Valle Lassalle, a/k/a "Manolo." Defendant's co-conspirators included Carlos Roberto Rodríguez Torres, a/k/a "Robert Caballo" ("Rodríguez"), David Ramos Rivera, a/k/a "Pecas" ("Ramos"), Javier Soto Alarcón, a/k/a "Chester" ("Soto"), Nicolas Peña Gonzalez, a/k/a/ "Nicky" ("Peña"), and Edward Llaurador Rodríguez ("Llaurador"). Until his detention in 1994, Raúl Santodomingo Romero ("Santodomingo") had played a major role in the drug-smuggling organization.

Defendant was involved in various shipments of narcotics into Puerto Rico. Defendant's role in these criminal activities included: Serving as captain of a speedboat to retrieve loads of drugs at sea; waiting at shore to pick up narcotics that had been delivered by boat; transferring narcotics within Puerto Rico; picking up empty gasoline drums left on the shore by other co-conspirators; and traveling from Puerto Rico to New York to sell cocaine. *See Docket Document Nos. 1041, 1132, 1134.*

On July 15, 1996, Rodríguez was executed by his co-conspirators in Yauco, Puerto Rico. At trial, the government relied on testimony from the following witnesses to establish the facts surrounding those

events: Soto; Ramos; Astrid Rodríguez, girlfriend of Llaurador; Madeline Torres Báez, girlfriend of Rodríguez ("Torres"); and Jorge Nazario Torres, homicide investigator for the Puerto Rico police department. *See Docket Document Nos. 1041, 1123, 1131–1133, 1135.* The government also introduced two sworn statements given by Llaurador on July 31, 1996, and September 13, 1996, at the district attorney's office in Ponce, Puerto Rico. *Docket Document No. 1141.* Llaurador had witnessed the murder of Rodríguez and was later killed, upon orders from Valle Lassalle, in retaliation for his cooperation with law enforcement in connection with Rodríguez' death. Llaurador's killers used machetes to decapitate him and mutilate his body.

On the night of July 15, 1996, Defendant, Peña, and a third man visited Torres' home in Yauco and waited for Rodríguez to arrive. Rodríguez had instructed Torres that she should page him when Peña arrived at her home. Upon Peña's arrival, Torres paged Rodríguez, and he called her home and spoke with Peña. After Rodríguez arrived, he told Torres that the men were going to visit Llaurador to talk to him. At the time, Rodríguez was inebriated. Before they left, Peña asked his companions whether there were firearms in their vehicle, and Defendant responded in the affirmative. The men departed in Rodríguez' white pick-up truck.

During the early morning hours, Llaurador visited his girlfriend, Astrid Rodríguez, at her house in Yauco. As the two were talking outside the home, they saw Rodríguez' white Toyota truck approach and then stop at the corner. Defendant exited the vehicle, and Rodríguez then drove away. Llaurador walked towards Defendant, who was holding an empty gas tank. Defendant asked Llaurador whether he could take Defendant into town to buy gas, and Llaurador agreed to do so.

Defendant got into Llaurador's red Toyota truck with him, and the two men departed.

Defendant informed Llaurador that Rodríguez wanted to kill him because he had stolen Rodríguez' off-road vehicle. Defendant told Llaurador not to worry, because nothing was going to happen to him. Instead of killing Llaurador, Peña was going to kill Rodríguez because Rodríguez had threatened to inform the Colombian owners of one of their drug shipments that some of his co-conspirators had stolen cocaine from them. In February 1996, Valle Lassalle and several co-conspirators had stolen approximately sixty-five kilograms of cocaine from the Colombians. Valle Lassalle had ordered Peña to assassinate Rodríguez to prevent him from snitching. Defendant's story about needing to buy gas was simply an excuse to get Llaurador to drive Defendant to meet the other co-conspirators.

Instead of going into town to purchase gas, Defendant directed Llaurador to drive towards the cockfighting arena, where they met Peña and Rodríguez, who was driving his white Toyota truck. Rodríguez and Peña drove towards Lake Vega in Yauco in Rodríguez' truck, and Llaurador and Defendant followed them in Llaurador's red truck.

At the dam, the two vehicles stopped. Peña got out of Rodríguez' white truck and into Llaurador's red truck, and Defendant got out of Llaurador's truck and into Rodríguez' truck. The two vehicles proceeded until they reached a small creek, and everyone exited the trucks.

Rodríguez pushed Llaurador against his truck and instructed Peña to shoot Llaurador four times. Peña pointed a gun at Rodríguez and told him that instead of killing Llaurador, he was going to shoot Rodríguez four times. Peña shot Rodríguez two times in the face, and the victim fell face down. Llaurador grasped the

victim's feet, and Defendant and Peña grabbed him by the arms. The three placed Rodríguez in the bed of his white truck. Defendant got into the driver's side of Rodríguez' truck, and Peña got into the passenger seat. Llaurador drove his red truck alone.

Llaurador drove ahead, and Defendant and Peña followed him. Defendant unintentionally drove the white truck into a ditch, and the vehicle became stuck in the mud. Rodríguez, who was still alive, raised himself from the bed of the truck. The victim asked Peña why he had shot him, and Peña replied, "Because you're a motherfucker." Peña then shot Rodríguez two more times, and the victim dropped down again. Peña and Defendant left the corpse in the back of the white truck, and the two got into Llaurador's truck. The three fled the scene.

As they were driving, Defendant told Llaurador to take off his shirt, because it was stained with blood. Llaurador removed his shirt, and Peña threw it away.

The original plan was for Defendant, Peña, and Llaurador to deliver Rodríguez' body to Valle Lassalle so that Valle Lassalle could dismember the corpse and then dispose of the remains. Defendant intended to keep Rodríguez' truck and dismantle it.

Since the white truck became dislodged in the muddy area near the lake, the three were forced to abandon their original plan and they left the truck, along with the body, at the scene of the murder.

Defendant was arrested on December 22, 1999. Following a month-long trial, a jury returned a guilty verdict against Defendant on October 6, 2000. *Docket Document No. 1101.*

On May 22, 2001, Defendant moved for a new trial on the basis of newly-discovered evidence. *Docket Document No. 1356.* Defendant claimed that new statements from Peña, Valle Lassalle, and Santodomingo denying Defendant's involvement in the drug-trafficking conspiracy and in the murder of Rodríguez constituted newly-discovered exculpatory evidence warranting a new trial.

In an Opinion and Order dated August 28, 2001, this court denied Defendant's motion for a new trial. *Docket Document No. 1404.* We found that Defendant had failed to meet the second prong of the *Wright* test for evaluating motions for a new trial brought under Rule 33 of the Federal Rules of Criminal Procedure. *See United States v. Wright,* 625 F.2d 1017, 1019 (1st Cir.1980). We noted that Defendant had not demonstrated that he had exercised due diligence to obtain exculpatory evidence from his co-conspirators, including Peña, Valle Lassalle, and Santodomingo, prior to trial. Moreover, we found that it was extremely improbable that testimony by Peña, Valle Lassalle, and Santodomingo at a retrial of Defendant would result in an acquittal, since these men are convicted murderers and drug dealers of very limited credibility. Following a review of the trial transcripts, we found that there existed substantial evidence in the record to support the jury's verdict.

On September 5, 2001, Defendant filed a motion for reconsideration of our August 28, 2001 Opinion and Order. *Docket Document No. 1141.*

This court scheduled the sentencing of Defendant for September 6, 2001. During his allocution, Defendant accused his trial counsel, Francisco Acevedo Padilla ("Acevedo"), of committing misconduct in the context of this case. *See Docket Document No. 1417.* Defendant maintained that his family had paid Acevedo $25,000 in exchange for his services. Defendant claimed that, despite the complexity of this case, Acevedo had visited him at the Metropolitan Detention Center in Guaynabo,

Puerto Rico, on only a few occasions, and that the attorney's main intention during those visits was to collect fees from Defendant. According to Defendant, Acevedo informed Defendant that the attorney did not have enough time to prepare for the trial to provide him with adequate legal representation.

Furthermore, Defendant maintained that he was entirely innocent of all charges brought against him. Defendant specifically claimed that Rodríguez was a friend of his, and that Defendant had no interest in taking Rodríguez' life. According to Defendant, on the night of July 15, 1996, the date that Rodríguez was murdered, he was visiting the home of one of his girlfriends. Defendant stated that he had been unable to convince this alleged alibi witness to come forward because she was now married and had a son. Defendant asserted that he did not get along with the man who was now married to. Defendant's former girlfriend. After hearing Defendant's allocution, we decided to continue Defendant's sentencing *sine die* so that this court could reconsider Defendant's motion for a new trial.

On October 18, 2001, this court held a hearing to reevaluate Defendant's motion for a new trial.

## II.

### *Analysis*

Pursuant to Rule 33 of the Federal Rules of Criminal Procedure, this court may grant a motion for a new trial "if the interests of justice so require." FED. R.CRIM.P. 33. The standard for granting a motion for a new trial is quite high.

A motion for new trial on the basis of newly discovered evidence will ordinarily not be granted unless the moving party can demonstrate that: (1) the evidence was unknown or unavailable to the defendant at the time of trial; (2) failure to learn of the evidence was not due to lack of diligence by the defendant; (3) the evidence is material, and not merely cumulative or impeaching; and (4) it will probably result in an acquittal upon retrial of the defendant.

*Wright*, 625 F.2d at 1019. "In considering ... a motion [for a new trial], the court has broad power to weigh the evidence and assess the credibility of both the witnesses who testified at trial and those whose testimony constitutes 'new' evidence." *Id.*

### A. *Defendant's Involvement in the Drug Conspiracy and in the Murder of Rodríguez*

■ At the October 18, 2001 hearing, Defendant called Peña, Valle Lassalle, and Santodomingo to the stand to buttress his contention of innocence. *See Docket Document No. 1437.* The government presented testimony from a former co-conspirator, Henry Pamias Burgos, a/k/a "Moncho Orejas" ("Pamias").

### 1. *Valle Lassalle's Testimony*

Valle Lassalle testified that he had ordered Peña to execute Rodríguez. Valle Lassalle wanted to have Rodríguez killed due to three reasons: (1) there was a dispute regarding stolen narcotics; (2) Rodríguez had threatened to kill the person who had bought the off-road vehicle that had been stolen from him, and Valle Lassalle had purchased that vehicle; and (3) Rodríguez owed Ramos money for cocaine.

On July 15, 1996, Valle Lassalle had visited Rodríguez' home. However, Valle Lassalle was not present at the scene of Rodríguez' murder. After the execution had been completed, Peña informed Valle Lassalle that Rodríguez had been killed and that Llaurador had been with them at the murder scene.

Valle Lassalle admitted that he knew Defendant and had been introduced to him

at Santodomingo's home. However, Valle Lassalle claimed that Defendant had never participated in any drug loads with Valle Lassalle, had never sold any narcotics for him, and had never transported drug money for him. Valle Lassalle stated that he had not sent Defendant to kill Rodríguez, and he had never been told that Defendant had been present at Rodríguez' killing. Valle Lassalle had been aware that Defendant had been indicted for Rodríguez' murder. Valle Lassalle testified that he had not come forth earlier to exculpate Defendant because he had been awaiting his own trial for the murder and did not want to incriminate himself.

Valle Lassalle also admitted that he had ordered the subsequent execution of Llaurador, because Llaurador had sold Rodríguez' off-road vehicle to Valle Lassalle, and because Llaurador had become a government informant against Valle Lassalle in the murder of Rodríguez.

Valle Lassalle is currently serving a life sentence.

We find that Valle Lassalle's testimony about Defendant's alleged non-involvement in the narcotics conspiracy to be completely lacking in trustworthiness. Valle Lassalle himself admitted at the hearing that he was only willing to inculpate persons who were deceased or persons who were government informants. Since Defendant is not deceased and is not a cooperating witness, Valle Lassalle was unwilling to name him as a co-conspirator involved in the heinous criminal activities of the underground organization. Consequently, we reject Valle Lassalle's testimony for purposes of evaluating Defendant's motion for a new trial.

### 2. Santodomingo's Testimony

Santodomingo testified that he was acquainted with Defendant because Defendant used to go to Santodomingo's farm in Isabela, Puerto Rico, with his friend Ramos. Defendant used to ride horses with Santodomingo's son.

Santodomingo admitted that Valle Lassalle had worked for him on drug loads. Santodomingo testified that Defendant had never participated in drug smuggling with him.

We find that Santodomingo's testimony does not shed any light on the issue of whether Defendant was involved in the narcotics conspiracy. Santodomingo has been detained since 1994 for money laundering. After Santodomingo was imprisoned, his former associates, including Valle Lassalle, Ramos, and Rodríguez, continued to smuggle controlled substances into Puerto Rico. As Santodomingo testified, numerous people were required to successfully smuggle in a drug load. Co-conspirators were required to complete numerous tasks, including driving vans or trucks to transport the drugs to a safe location, looking out for law enforcement, and distributing the drugs. While he was in prison, Santodomingo did not keep abreast of all the details of the on-going drug-smuggling operations. Santodomingo did not have knowledge about whether, in fact, Defendant had become an integral member of the underground organization. Consequently, we disregard Santodomingo's testimony.

### 3. Peña's Testimony

Peña admitted that he had murdered Rodríguez, because Rodríguez was planning to tell the Colombians about the stolen cocaine, and the Colombians would then have killed Valle Lassalle, Ramos, and other co-conspirators. Peña acted out of loyalty to Valle Lassalle and the organization and was not paid for the assassination.

According to Peña's version of the events of July 15, 1996, only he and Llaurador were present at the scene of the

killing. Llaurador drove his red Toyota truck by himself to Lake Vega. Peña claimed that it was him, not Defendant, who drove Rodríguez' white Toyota truck containing Rodríguez' body away from the murder scene. After the truck became stuck in an embankment, Peña allegedly used his shirt to wipe his fingerprints off the truck. As Peña was exiting the truck, Rodríguez got up and Peña shot him two more times. Peña then rode in Llaurador's red truck with Llaurador to the home of another co-conspirator, Pamias. Llaurador woke Pamias up and asked him to drive Peña back to Aguadilla because Llaurador's truck was low on gasoline. Llaurador and Pamias drove Peña to the home of their co-conspirator, "Jun", in the public housing project in Aguadilla, and Jun and Peña then visited Valle Lassalle's home to inform him about the murder.

Peña avers that Defendant was not present at the murder of Rodríguez. According to Peña, he first met Defendant when they were both incarcerated at the Metropolitan Detention Center after they had been arrested in conjunction with this case. Peña claims that he had not come forth earlier regarding Defendant's alleged innocence because Peña had been involved in plea negotiations.

Peña is currently serving a sentence of thirty years of imprisonment.

Peña conceded that he used to work at the drug points at Cuesta Vieja in Aguadilla and at the Ducós public housing project. Peña himself used drugs. In addition to the murder of Rodríguez, Peña has admittedly shot at least four other people. At the time of Peña's arrest in Framingham, Massachusetts, he had been traveling and working under a false name to thwart law enforcement authorities.

Given Peña's extensive history of grave criminal infractions, we decline to credit his October 18, 2001 testimony. Peña has played a substantial role in the shipment of narcotics into Puerto Rico and the distribution of these substances on the island. Peña has employed deceptive techniques to evade capture by the authorities. Most significantly, Peña has admitted to being a dispassionate killer who lacks empathy and will murder human beings without hesitation. We conclude that Peña's testimony does not present any reason for this court to disturb the jury's verdict.

### 4. Conclusion

Defendant has failed to adduce any evidence warranting the extraordinary remedy of the new trial he requests. At the September 6, 2001 hearing during which Defendant was originally scheduled to be sentenced, Defendant claimed that he was completely innocent and had been visiting the home of a girlfriend on the night of Rodríguez' murder. We stated on the record that we were willing to take extraordinary measures to protect the confidentiality of any witness who did not want to compromise his or her privacy because of personal complications. If necessary, this court was willing to take the atypical step of taking testimony under seal to prevent intrusion into the personal lives of the individuals involved and to ensure that an innocent man was not punished for a crime he did not commit.

Defendant has not pursued his alibi of the phantom girlfriend he claims that he was with on July 15, 1996. Since September 6, 2001, neither Defendant nor his current counsel, Lydia Lizarribar, have made any mention of any alleged woman who could account for Defendant's whereabouts on the night that Rodríguez was killed. Defendant has not filed any motion seeking assistance from this court to secure the testimony of Defendant's alleged girlfriend. Defendant did not request the presence of any alibi witness at our October 18, 2001 hearing.

Our patience has worn thin. This court is convinced that Defendant's September 6, 2001 expressions of sorrow about Rodríguez' death and his protestations of innocence were nothing more than brazen, sordid lies. Defendant's conviction still stands. We are extremely displeased that Defendant's self-serving misrepresentations have put an additional burden upon a court already taxed with numerous other important matters requiring our attention. We will issue an order rescheduling his sentencing hearing. At sentencing, we will take into consideration Defendant's blatant deception to this court.

### B. *Attorney Acevedo's Misconduct*

██ This court has an obligation and a responsibility to supervise the conduct of the lawyers who appear before us and to promote high standards of ethical behavior. *See Culebras Enters. Corp. v. Rivera–Rios*, 846 F.2d 94, 97 (1st Cir.1988). This court, as the ultimate guarantor of its own integrity, bears the duty of ensuring compliance with its norms of conduct. We view complaints of attorney misconduct as very serious matters, and we will give such matters the careful attention they deserve.

#### 1. *Attorneys' Fees*

██ On September 6, 2001, Defendant stated that he was displeased with Acevedo's performance. Defendant claimed that his family had paid Acevedo $25,000 in fees, but that Acevedo's representation of him was unsatisfactory.

#### a. *Acevedo's Testimony*

On October 18, 2001, Acevedo testified regarding his involvement in Defendant's case. Acevedo claimed that he had received three payments in cash totaling $12,800 in fees for his representation of Defendant. In December 1999, Mayleen Maldonado, Defendant's common-law wife, made a $2,800 payment in court for Acevedo's assistance with the initial proceedings.

Sometime between January and June 2000, Maldonado made a $5,000 payment to Acevedo in the parking lot of Plaza las Américas in Hato Rey, Puerto Rico. Maldonado made another $5,000 payment to Acevedo in court during one of the status conferences in the case at bar. Acevedo did not provide any contracts to be signed by Defendant or his family regarding his services. Acevedo claimed that he did not have any written record regarding the amount of fees paid to him by his clients. Acevedo testified that he had originally planned to receive $30,000 to serve as second chair for the case.

It appears that Defendant is arguing that Acevedo swindled him and his family by charging exorbitant fees and claiming that such fees were necessary to defend him in a capital sentence. Acevedo testified that at the outset of the case, the Assistant United States Attorneys prosecuting Defendant and his co-conspirators had not determined whether they were going to pursue the death penalty against Defendant. After a couple of months into the case, AUSA Stephen Muldrow informed Acevedo that the government would not be seeking a death sentence against Defendant. Acevedo did not file any motion requesting that a capital sentence be taken off the table for Defendant, since such a motion was not necessary.

#### b. *Maldonado's Testimony*

Maldonado testified that she had paid Acevedo $24,800 for his representation of her common-law husband. The first payment took place at Acevedo's office in Hato Rey. Maldonado, who was accompanied by her mother, Alma Martin, and Defendant's brother José Genao, gave Acevedo $2,800 in cash. In March 2000, Maldonado, accompanied by José Genao, made two payments of $5,000 each to Acevedo at his office in San Patricio, Puerto Rico. Maldo-

nado testified that she made a third $5,000 payment to the attorney at his San Patricio office in April 2000. On that occasion, she had been accompanied by Martin. In June 2000, Maldonado made another $5,000 payment that was delivered to Acevedo at the parking lot of the Toys 'R' Us store in Hato Rey. On the day that the jury returned its verdict against Defendant in October 2000, Maldonado gave Acevedo a final $2,000 payment. Maldonado made notations about the various payments in a personal notebook. Martin corroborated that she had been present at the time Maldonado made three payments to Acevedo.

Maldonado never obtained any receipts from Acevedo. On several occasions, she asked Acevedo for receipts, but he always answered that he would give the receipts to Defendant instead. The bulk of the money paid to counsel was obtained through two bank loans totaling $19,000.

According to Maldonado, Acevedo had originally quoted a price of $60,000 for his services. Acevedo stated that half of the money was to compensate him for representing Defendant in a death penalty case, and the other half was for representing him at trial.

This court has adopted the American Bar Association's Model Rules of Professional Conduct as the standards governing ethical conduct of attorneys. D.P.R.Loc.R. 211.4(B).

"When the lawyer has not regularly represented the client, the basis or rate of the fee shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation." MODEL RULES OF PROF'L CONDUCT R. 1.5(b) (1983). Providing a written statement about the fee arrangements to the client decreases the possibility of misunderstanding. *Id.* cmt. (1983). A lawyer may provide the client only a simple memorandum or a copy of his or her customary fee schedule. *Id.*

Here, it appears that Acevedo failed to provide any written statement to Defendant or Maldonado regarding the basis or rate of his fee. We admonish Acevedo for this omission. There is nothing in the record indicating that Defendant had been a regular client of Acevedo and would, therefore, have had knowledge about the manner in which Acevedo calculated his fees. If Acevedo had provided a short memorandum or other document outlining the fees he intended to charge Defendant, he could have averted much confusion on the part of his client. While Rule 1.5(b) of the Model Rules of Professional Conduct does not impose a mandatory requirement that attorneys always provide a written statement about fee arrangements to his or her client, we feel it would be prudent to impose such a requisite on the members of the bar of this court. Such a rule would reduce the possibility of misunderstanding and would clarify the financial relationship between attorney and client. It would not pose a significant hardship for an attorney to provide a standard statement of his or her usual fee schedule to the paying clients that he or she is representing.

Furthermore, we conclude that attorneys should be required to maintain records detailing the amount of fees paid by clients. It would not be a substantial imposition to require attorneys to keep records of payments made by their clients, and most lawyers probably already do so. Such records would greatly reduce the risk of disputes arising regarding the amount of fees paid.

For these reasons, we hereby order the members of the bar of the United States District Court for the District of Puerto Rico to provide a written statement about fee arrangements to all paying clients who the attorney has not regularly represented

in the past. This order applies to attorneys appearing before this judge who take on new clients after this Opinion and Order has been docketed. In addition, we order members of the bar appearing before this judge to maintain accurate records about payments of fees by their clients.

### 2. *Dishonesty*

Defendant's mother, Nereida Sánchez, and Defendant's sister, Aura Genao Sánchez, testified that Acevedo had placed intense pressure on them to convince Defendant to accept a guilty plea. During one of the hearings held before this court regarding the present case, Defendant and Acevedo met with Defendant's mother and two sisters. Both Defendant's mother and sister testified that Acevedo had warned that if Defendant did not plead guilty, law enforcement agents would banish him to an underground prison where he would never again see the sun or the moon, and he would eventually become blind. We find these unsophisticated witnesses to be highly credible on this issue, and their testimony is uncontroverted.

▇ A lawyer has a fundamental duty to be honest with his or her client. *See* JOHN WESLEY HALL, JR., PROFESSIONAL RESPONSIBILITY OF THE CRIMINAL LAWYER § 3:2 (2d ed.1996). "It is professional misconduct for a lawyer to ... engage in conduct involving dishonesty, fraud, deceit or misrepresentation." MODEL RULES OF PROF'L CONDUCT R. 8.4(c) (1983).

▇ This court is appalled that Acevedo brazenly misrepresented to Defendant and his family the conditions of imprisonment Defendant would face if he exercised his constitutional right to go to trial and was then convicted. We sharply reprimand Acevedo for his dishonesty, and we warn him that we will not tolerate attorneys making blatant misrepresentations to their clients for any reason. This court expects and demands that attorneys at all times comport themselves with the utmost integrity, befitting an officer of this court. We note in passing that Acevedo's representation of Defendant did not fall below the standards imposed by the United States Constitution.

### III.

### *Conclusion*

In accordance with the foregoing, we **DENY** Defendant's motion for reconsideration of our denial of his motion for a new trial. *Docket Document No. 1411.*

**IT IS SO ORDERED.**